IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

THE WEINBERG GROUP, INC.,       )
                                )
          Plaintiff,            )
                                )
v.                              )    CIVIL ACTION 04-410A (JCC)
                                )
AON CONSULTING, INC., et al     )
                                )
          Defendant.            )

# M E M O R A N D U M   O P I N I O N

This matter came before the court for a nonjury trial on February 14 and 15, 2005 pursuant to the Complaint filed by The Weinberg Group, Inc., ("Weinberg,") and against the Defendant Aon Consulting, Inc., ("Aon").  The Complaint sought damages for professional negligence and indemnification for litigation costs in defending third-party suits allegedly resulting from Aon's actions.[1]

## I. Findings of Fact

1.  Plaintiff Weinberg is a Maryland corporation with its principal place of business in the District of Columbia. Weinberg is a scientific consulting firm which provides advice and counsel to corporations.  (Tr. at 55).  Weinberg has 55 employees around the world.  (*Id.*)  Matthew Weinberg,

---

[1] The Complaint contains a count for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974, ("ERISA,") codified at 29 U.S.C. §§ 1001 *et seq.,* but Weinberg declined to proceed on that count at trial.  (Tr. at 4).

("Mr. Weinberg,") has been Weinberg's Chief Executive Officer since about 1997.  (*Id.*)

2.  Defendant Aon is a New Jersey corporation that provides actuarial services and has its headquarters in Richmond, Virginia.  It deals with the administration of pension and other benefit plans.

3.  In June 1999, Aon acquired WTR Consulting, ("WTR").  Many people formerly employed by WTR are with Aon today.

4.  Mr. Weinberg established The Weinberg Consulting Group, Inc. Pension Trust, ("the Plan,") for Weinberg employees in 1983. (Pl.'s Ex. 1).  The Plan is a defined benefit plan pursuant to section 401(a) of the I.R.S. Code.  *See* I.R.C. § 401(a). A defined benefit plan is one that establishes a defined formula for calculating employee benefits.  Weinberg is the administrator of the Plan.

5.  On October 20, 1997, Aon, through its predecessor WTR, proposed "to perform actuarial/administrative services necessary to maintain" the Plan.  (Def.'s Ex. 3 at 2).  The parties agree that the proposal is the operative document that sets forth the terms of the agreement.  (Tr. 60, 234). The primary services were:

> 1.  Preparation of the plan valuation and report/ certification by Enrolled Actuary;
> 2.  Calculation of benefits for retirees and vested terminated employees;
> 3.  Client consultations with respect to plan valuation, routine administration, legislative

developments/compliance, etc.
(*Id.*)

6.   Aon, through WTR, also proposed to "perform benefit calculations for the retirement, death, disability or vested termination of employment of a plan participant.  This actuarially certified benefit will be the basis for the direction of payment to the participant."  (*Id.* at 3).

7.   The Plan had several problems.  Poor market performance of the Plan's investments, increased growth and employee salaries, and low interest rates resulted in the Plan being underfunded, i.e. its liabilities exceeded its assets.  (Tr. at 242).

8.   The Plan was subject to the "Top 25 rule" which provides that security must be posted for any lump sum distribution made to the 25 most highly compensated employees.  *See* 26 C.F.R. § 1.401(a)(4)-5(b); Rev. Rule 92-76, 1992-2 C.B. 76 (1992).  Security for the lump sum payment can take the form of a bank letter of credit for 100% of distribution, a bond for 100% of distribution, or an amount representing 125% of the distribution being placed in escrow.  Rev. Rule 92-76.

9.   Lump sum distributions were made to employees who were among the 25 most highly compensated employees on May 15, 1996, May 12, 1997, June 27, 1997, June 18, 1998 (two distributions), March 25, 1999 (two distributions), June 7, 1999, June 8, 1999, and June 12, 2000.  The participants

-3-

were not required to post security for these distributions. Weinberg was unaware of the Top 25 rule and made the distributions to highly compensated employees in violation of this rule.

10. The first three distributions, ("Distributions 1-3,") were made before Aon, through WTR, became Weinberg's actuary. Weinberg's previous actuaries calculated the next two distributions, ("Distributions 4-5,") but the distributions were made after Aon, through WTR, became Weinberg's actuary. Aon calculated and directed Weinberg to make the remaining five distributions, ("Distributions 6-10.")

11. Aon did not advise Weinberg that Distributions 1-3 violated the Top 25 rule. Aon did not prevent distribution of Distributions 4-5 for violating the Top 25 rule. Aon stipulates that it failed to, but should have prevented Distributions 6-10 because they violated the Top 25 rule.

12. As of January 1, 1999, Aon calculated the assets of the Plan to be $2,433,713. (Pl.'s Ex. 95 at 4). According to Aon's calculations, as of January 1, 1999, the total value of accrued lump sum benefits for the employee participants of the Plan was $4,949,466. (Pl.'s Ex. 122 at 18-57). To fully fund the Plan as of January 1, 1999, Weinberg would have had to contribute $2,515,753. (Pl.'s Exs. 95 at 4, 122 at 18-57, 147B).

-4-

13. When calculating a highly compensated employee's request for a lump sum distribution in May 2001, Aon realized that some prior distributions were made in violation of the Top 25 rule and notified Weinberg. It was at this time that Weinberg first became aware that distributions had been made in violation of the Top 25 rule.

14. On October 7, 2002, Weinberg entered into the Employee Plans Compliance Resolution System - Voluntary Correction of Operational Failures, ("the compliance program,") of the Internal Revenue Service, ("I.R.S."). (Pl.'s Ex. 15). Weinberg hired the law firm of Emery, Wills, and McDermott to assist Weinberg with entering into the compliance program.

15. Having discovered the violations of the Top 25 rule, the I.R.S. gave Weinberg three options: (1) Weinberg could obtain security for the unlawful distributions; (2) Weinberg could make an additional contribution to the Plan to ensure that Plan assets equaled or exceeded 110% of the Plan's current liabilities; or (3) Weinberg could terminate the Plan. (Pl.'s Ex. 150). Weinberg first attempted to obtain security. By letter dated February 10, 2003, Aon stated that it was "willing to help [Weinberg] mitigate the losses that [it was] unable to collect from the participants," but wanted to know first what steps Weinberg had taken towards

obtaining the security from the former employees who had received the distributions.  (Pl.'s Exs. 138, 141).  On June 13, 2003, Aon refused to provide the security for the ten highly compensated employees who received their distributions without providing security to the Plan.  (Pl.'s Ex. 140).  Aon denied any negligence on its part and claimed that Weinberg had not fulfilled its duty to obtain repayment from the participants.  (*Id.*)

16. On August 5, 2003, Karen Becker, a former Weinberg employee who was not one of the highly compensated employees, filed a lawsuit, ("the Becker suit,") in the United States District Court in the District of Columbia against Weinberg and its current and future principals for violations of ERISA.  (Pl.'s Ex. 136).  Becker alleges that the defendants knowingly paid restricted lump sum distributions in derogation of law and discriminated against her by requiring her to post a security in order to receive a lump sum distribution.  She seeks damages, attorneys' fees, and costs.  Weinberg hired the law firm of Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig to defend Weinberg in the Becker suit.

17. By letters dated January 9, 2004, Weinberg attempted to obtain the security from the former employees, but was unable to do so.  (Pl.'s Exs. 16-34).

18.   Weinberg determined that it would be impossible to post
      security for the distributions and the only option was to
      terminate the Plan.  (Tr. 97).  The total security to be
      posted was approximately $2.7 million which had to be
      secured in a letter of credit.  Weinberg could not come up
      with the necessary collateral to secure the underfunded $2.7
      million because the collateral had to be "liquid assets to
      underlay a letter of credit," which would have been
      transferred to the bank's control.  (Tr. at 97-98, 365).
      Weinberg did not have the liquid assets required by the
      bank.  (*Id.*)  In order to terminate the Plan, he had to
      fully fund the Plan.  To fully fund the Plan as of July 1,
      2005, Weinberg had to contribute $2,693,535.  (Pl.'s Ex.
      147B).  He was able to fully fund the Plan by borrowing
      roughly $2.7 million because he was able to use as
      collateral his personal guarantee, his wife's personal
      guarantee, his parents' personal guarantee, and illiquid
      personal assets.  (Tr. at 98, 364; Pl.'s Ex. 154).[2]  The
      collateral required for the two loans were completely
      different.  (Tr. at 98, 364).

19.   On April 8, 2004, Weinberg filed suit against Aon alleging
      breach of fiduciary duty, professional negligence, and

---

[2] Mr. Weinberg testified that he borrowed roughly $3 million, (Tr. at 98, 364), but Weinberg has clarified that the loan was for $2.7 million. (Pl.'s Ex. 154).

indemnification for litigation costs in defending third-party suits allegedly resulting from Aon's actions. Weinberg proceeded to trial on its claims for professional negligence and indemnification.  Weinberg seeks four different categories of damages, ("Categories A-D").  For Category A, Weinberg seeks costs, including application fees and interests, of the loan necessary to fully fund the Plan in the amount of $823,523.93.  (Pl.'s Ex. 154).  For Category B, Weinberg seeks the difference between the amount needed to fully fund the Plan from January 1, 1999 to July 1, 2005 in the amount of $177,782.00.  (*Id.*)  For Category C, Weinberg seeks costs and attorneys' fees associated with the compliance program.  For Category D, Weinberg seeks costs and attorneys' fees associated with defending the Becker suit.  The parties have agreed that should the Court determine that Aon is liable to Weinberg for the costs and fees in Categories C and D, they will submit evidence of the amounts of those fees in a post-trial hearing pursuant to Rule 54(d)(2)(B)-(D) of the Federal Rules of Civil Procedure.  (Stipulation & Order, Dec. 16, 2004).  As of March 25, 2005, the total damages sought were $1,001,305.93 plus the attorneys' fees and costs relating to the compliance program and defense of the Becker suit.

## II. Analysis

Prior to trial, Aon stipulated that it was liable for professional negligence, but argued that because Weinberg's damages were not proximately caused by Aon's negligence, it was not liable to Weinberg for damages.  (Stipulation, Feb. 7, 2005).  However, Aon only stipulated that it was negligent as to Distributions 6-10, thus the Court must determine whether Aon was negligent as to Distributions 1-5.  Both parties stipulated that Virginia law applies in this case.  (Tr. at 5).

To establish actionable negligence, Weinberg has the burden to show that: (1) Aon owed Weinberg a legal duty; (2) Aon breached that duty; and (3) damages were proximately caused by that breach.  *See Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003)(citations omitted).  "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Id.* (quoting *Beale v. Jones*, 171 S.E.2d 851, 853 (Va. 1970)).  Although facts may be established by circumstantial evidence, such evidence "must be sufficient to establish that the result alleged is a probability rather than a mere possibility."  *Id.* (quoting *S. States Coop., Inc. v. Doggett*, 292 S.E.2d 331, 335 (Va. 1982)(internal citation omitted)).  Stated another way, the proximate cause of an injury is that act or omission which

immediately causes or fails to prevent the injury; an act or omission occurring or concurring with another, without which the injury would not have been inflicted, notwithstanding the other act, provided such injury could reasonably have been anticipated by a prudent man, in the light of attendant circumstances. *Huffman v. Sorenson*, 76 S.E.2d 183, 187 (Va. 1953)(citations omitted).

Aon argues that Weinberg's allegations regarding Distributions 1-5 are improperly made, and that even if they are properly made, that Weinberg has not proved that Aon had a duty to audit Distributions 1-5 which were calculated and approved by Aon's predecessor.  Aon argues as to Distributions 6-10 that Weinberg cannot show that its damages were proximately caused by Aon's breach.  The Court will address each of these arguments.

## A. Distributions 1-5

Weinberg argues that Aon had a duty to inform Weinberg that: (1) the Plan was not in compliance with the Top 25 rule on Distributions 1-3; and (2) Distributions 4-5 should not be paid in unrestricted lump sums because such payments would violate the Top 25 rule.  Aon argues that Weinberg may not expand its case to include Distributions 1-5 given that neither the Complaint nor Weinberg's discovery responses represented that Weinberg was seeking damages related to these distributions.

Under the liberal rules of federal pleading, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *In re Landbank Equity Corp.*, 83 B.R. 362, 377 (E.D. Va. 1987)(quoting Fed. R. Civ. P. 8(a)(2)).  However, the complaint must contain a demand for judgment for the relief the pleader seeks.  Fed. R. Civ. P. 8(a)(3)(2005).  A plaintiff's right to recovery is controlled by the allegations contained in the body of his complaint.  *Landbank Equity*, 83 B.R. at 376 (citing *Compton v. Alton Steamship Co.*, 608 F.2d 96, 105-06 (4th Cir. 1979)).  The statement of the claim "need only be as detailed as necessary to 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Weinberg's Complaint alleges:

> 10. From time to time *during Aon's performance* of the [contract with Weinberg], certain Employee Participants ceased to be employed by the Weinberg Group, thereby becoming entitled to receive their accrued benefit subject to the terms of the Pension Trust.  Of these Employee Participants, some elected to receive a lump sum distribution of their accrued benefit, ("the Elected Lump Sum Distributions.")
> 11. *As to each of the Elected Lump Sum Distributions, The Weinberg Group requested and directed that Aon review the elections and either approve or disapprove each one*, as appropriate, according to the terms of the Pension Trust and/or applicable law.
> 12. *Aon specifically approved payment by The Weinberg Group of each of the Elected Lump Sum Distributions* as a precondition to the Weinberg Group's payment of those amounts.
> 13. Unbeknownst to The Weinberg Group, Aon disregarded

-11-

certain restrictions on payment of lump sum
distributions that are contained both in the Pension
Trust and in applicable federal law and, instead,
*improperly approved payment of the Elected Lump Sum
Distributions* . . . .
14. Unbeknownst to The Weinberg Group, *Aon failed to
determine that the Top 25 Restrictions applied to
certain of the Elected Lump Sum Distributions, (the
"Restricted Lump Sum Distributions,")* and therefore
rendered payment of the Restricted Lump Sum
Distributions improper.
. . .
25. In connection with performing its contractual
obligations, Aon owed, and continues to owe, The
Weinberg Group a duty of care, specifically a duty to
exercise the care of those ordinarily skilled in the
business, when executing its contractual obligations to
The Weinberg Group.
26. Aon breached its duties to The Weinberg Group by,
among other things, disregarding the Top 25
Restrictions contained in the Pension Trust and in
applicable federal law . . . .
Compl. ¶¶ 11-14 (emphasis added).

The allegations contained in the Complaint clearly only
cover distributions for which Aon calculated and approved
payment.  It is undisputed that Aon calculated only Distributions
6-10, (Def.'s Ex. 9, Tr. 213), and breached its duty of care by
failing to determine that those distributions violated the Top 25
rule.  (Stipulation, Feb. 7, 2005; Pl.'s Ex. 137 at ¶ 5(e); Tr.
at 185-86).  Weinberg's previous actuaries calculated
Distributions 1-5.  (Def.'s Ex. 9, Tr. at 169, 190, 213).  Mr.
Weinberg admitted that Weinberg's previous actuaries were
negligent.  (Tr. at 149).  Because the Complaint does not contain
any allegation that Weinberg was seeking damages resulting from
Aon's breach of its duty of care as to Distributions 1-5, which

-12-

Aon did not calculate and approve, Aon was not given fair notice and Weinberg may not recover based on those first five distributions.[3]  *See Landbank Equity*, 83 B.R. at 377 (affirming award of punitive damages where amended complaint was "replete with particularized allegations" of conduct upon which punitive damages could be awarded)*; see also Martin v. Equity One Consumer Disc. Co., Inc.*, 194 F. Supp. 2d 469, 472 (W.D. Va. 2002)(citing Fed. R. Civ. P. 8(a)(3) and dismissing complaint that sought only statutory damages for violation of a statute for which statutory damages were unavailable).

**B. Distributions 6-10**

        Aon argues as to Distributions 6-10 that Weinberg cannot show that its damages were proximately caused by Aon's breach.  Aon argues that had Weinberg posted security for Distributions 6-10, thereby directly remedying the violations of the Top 25 rule caused by Aon's actions, Weinberg could have sought reimbursement from Aon for the expenses incurred in posting such security.  Aon argues that none of the damages

_____

[3] Weinberg's argument that his counsel confirmed that Weinberg was charging Aon with failing to advise Weinberg that prior distributions, i.e. Distributions 1-3, were made in violation of the Top 25 rule and that payment of additional distributions, i.e. Distributions 4-5, would violate the Top 25 rule lacks merit.  Even if his counsel did so confirm these allegations, the Federal Rules of Civil Procedure clearly require allegations upon which the plaintiff seeks recovery to be contained *in the body of his complaint*. *Landbank Equity*, 83 B.R. at 377 (citing *Compton v. Alton S.S. Co.*, 608 F.2d 96, 105-06 (4th Cir. 1979)(emphasis added)).

sought by Weinberg were proximately caused by Aon's breach.  The Court agrees.

## 1. Category A damages

For Category A, Weinberg seeks costs, including application fees and interests, of the loan necessary to fully fund the Plan in the amount of $823,523.93.  (Pl.'s Ex. 154). Having discovered the violations of the Top 25 rule, the I.R.S. gave Weinberg three options: (1) Weinberg could obtain security for the unlawful distributions;[4] (2) Weinberg could make an additional contribution to the Plan to ensure that Plan assets equaled or exceeded 110% of the Plan's current liabilities; or (3) Weinberg could terminate the Plan.  (Pl.'s Ex. 150). Weinberg first attempted to obtain security, but was unable to do so.  The ten former employees who received the lump sum distributions refused to post the security, as did Aon.  Weinberg could not post the security itself because it could not come up with the requisite liquid assets as collateral for the letter of credit.

---

[4] Aon argues that Weinberg's evidence as to its inability to obtain security is not properly before the Court because Weinberg did not disclose the evidence during discovery.  By failing to object on these grounds when Weinberg admitted this evidence during trial, Aon waived its objections.  (*See* Tr. at 97-100, 364-66); *MicroStrategy Inc. v. Bus. Objects, S.A.*, 331 F. Supp. 2d 396, 419-20 (E.D. Va. 2004).  Aon's argument made during closing arguments that the question was not objectionable lacks merit.  Aon could have objected after Mr. Weinberg had begun to testify about his inability to obtain security and Weinberg's counsel then asked Mr. Weinberg the following question: "When you say you couldn't find the money to get a letter of credit, what do you mean?"  (Tr. at 97).

In order to make Plan assets equal or exceed 110% of the Plan's liabilities, Weinberg would have had to contribute $2,944,473.80, almost $300,000 more than Weinberg had to contribute to fully fund and terminate the Plan.  (Pl.'s Reply to Def.'s Post-Trial Br. at 6).  Thus Weinberg chose to terminate and fully fund the Plan.

Since Aon has stipulated that it breached its duty to Weinberg on Distributions 6-10, the Court must determine what, if any, damages were proximately caused by that breach.  As explained above, Weinberg may not recover for damages caused by any breach on Aon's part with respect to Distributions 1-5.  *See supra* Part A.

Weinberg has failed to show that the Category A damages resulted from Aon's negligence on Distributions 6-10.  Category A damages are the costs of having to fully fund the Plan now.  However, after Distributions 1-5, Weinberg had already violated the Top 25 rule.  (*See* Tr. at 186).  Had Distributions 6-10 not occurred, Weinberg would have still been in violation and required to remedy that violation once the I.R.S. learned of it.

After Distribution 10 was made and Weinberg notified the I.R.S. about Distributions 1-10, the I.R.S. gave Weinberg three options.  Weinberg ultimately chose to fully fund and terminate the Plan.  (Tr. at 97).  Category A contains damages caused by Distributions 1-10 and Weinberg has not provided any

evidence of what portion of those damages were caused by Distributions 6-10.

The Virginia Supreme Court has instructed:

> A plaintiff is not required to prove the amount of his damages with mathematical precision; he is required only to produce sufficient facts and circumstances that will permit a jury to make an intelligent and reasonable estimate of the amount.

*Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.,* 453 S.E.2d 261, 268 (Va. 1995)(citations omitted)(reversing trial court's grant of summary judgment where estimates would have afforded a jury a sufficient basis for estimating the damages with reasonable certainty).

"The reasonable certainty standard requires more than speculation, but does not require absolute certainty." *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 548 (M.D.N.C. 2002)(citation omitted). "Once a plaintiff demonstrates the fact of damages with reasonable certainty, courts often allow plaintiffs some flexibility in showing the actual amount of damages." *Id.* (citing *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 576 (1931)(stating that plaintiffs should have some latitude in arguing uncertain damages when defendant's wrongdoing is the source of uncertainty)).

However, Weinberg has not produced any facts to permit the Court to make an intelligent and reasonable estimate of the amount of damages in Category A which were caused by Aon's breach of its duty of care with respect to Distributions 6-10. Absent this evidence, the Court must deny these damages.

### 2. Category B damages

For Category B, Weinberg seeks $177,782, the difference between the amount needed to fully fund the Plan on January 1, 1999 and the amount needed to fully fund the Plan on July 1, 2005. Weinberg argues that Aon had a duty to advise Weinberg that Distributions 1-5 were not compliant with the Top 25 rule which would have allowed Weinberg to address the first five violations and not commit the additional five violations. (Pl.'s Post-Tr. Br. at 15). Weinberg argues that had Aon advised that Distributions 1-5 were not compliant, Weinberg would have fully funded and terminated the Plan at that time, roughly on January 1, 1999. (*Id.*)

Aon argues that Weinberg is precluded from seeking these damages because Weinberg failed to include this item in its discovery responses. However, these damages are a subset of damages which were included in Weinberg's Supplemental Answers to Defendant's Second Interrogatories. (Def.'s Ex. 31 at 2-3). They are a portion of "Three Million Dollars ($3,000,000.00), comprising the principal amount of the loan necessary fully to fund the Pension Trust" that Weinberg was originally seeking. (*Id.*) Aon's own expert pension actuary, Vincent Amoroso, testified that the $177,782 was a subset of the total underfunding which Weinberg initially sought in the Complaint. (Tr. at 280-810).

Aon had notice that Weinberg was seeking the principal amount of the loan to fully fund the Plan. Moreover, Weinberg explains that because Aon did not provide its calculation for the current amount necessary to fully fund the Plan until February 10, 2005, just days before trial, Weinberg was unable to determine its exact Category B damages any earlier. (Pl.'s Reply to Def.'s Post-Trial Br. at 7). Because Weinberg had disclosed that it was seeking the entire amount of the loan principal, Aon is not prejudiced by Weinberg now seeking only a subset of that amount. The Court will consider whether Weinberg is entitled to the Category B damages.

After the I.R.S. learned of Distributions 1-10, it gave Weinberg three options and Weinberg chose to fully fund and terminate the Plan. Mr. Weinberg testified that termination was the "last available resort" and that termination was the only viable means of resolving the problem to the I.R.S.'s satisfaction once the participants and Aon refused to post security. (Tr. at 99-100). This required less money than the 110% option. Weinberg seeks damages for Aon's exacerbation of the problem by directing Distributions 6-10. (Tr. at 148-49). Mr. Weinberg testified:

> Because the Internal Revenue Service, as a result of
> our submitting ourselves to voluntary compliance
> because [Aon] gave me negligent advice, has forced us
> to a point that we have to terminate the plan today.
> The fact that continues to be ignored . . . is that
> they gave us 60 days to either come up with a letter of

> credit, which I cannot do, or terminate and fully fund
> the plan.  It's not a question of timing.  It's not
> because I wanted to do it now.  It's because I have no
> choice.

(Tr. at 373).

Mr. Weinberg testified that he tried every way he could
to post the security, and that termination was not his first
choice.  (Tr. at 365-66).  He explained that termination of the
Plan hinders his personal and business interests because he and
his parents are now "on the hook for $3 million."  (Tr. at 366).
He stated, "this was not something I chose to do.  It wasn't
something I wanted to do, and it's something I have had no choice
but have to do."  (Tr. at 366).

Weinberg's expert actuary Bernard Forseter testified
that the decision to terminate the Plan was reasonable.  (Tr. at
203).  During cross examination, Robert Sanford, a vice-president
and actuary in the retirement practice with Aon, explained that
if the company cannot post security or fully fund the Plan, the
I.R.S. would disqualify the Plan.  Sanford acknowledged that
termination of the Plan is a far less draconian expense to the
Plan and all associated with it than is disqualification of the
Plan.  (Tr. at 255-56).

When asked whether Weinberg could have avoided fully
funded termination had Aon posted the security, Amoroso was
evasive and defensive, quibbling over phrasing of the questions.
(*See* Tr. at 324-26).  Ultimately, he agreed that "if Aon had

-19-

posted the security they were asked to post, any arguable IRS need for this plan to terminate would have gone away." (Tr. at 326). Aon admits that had Weinberg posted the security on Distributions 6-10, Weinberg could have sought reimbursement from Aon for that amount. (Def.'s Post-Trial Br. at 16-17).

Amoroso testified that it would not have been much more difficult for a small company with less lending history like Weinberg than a more credit-worthy company like Aon to obtain the necessary loan to post the security. (Tr. at 343). However, Amoroso admitted that he did not look at any financial documents associated with Weinberg or Mr. Weinberg in reaching this conclusion and that he had no idea what Weinberg's and Mr. Weinberg's credit and borrowing ability was. (Tr. at 344). Amoroso also testified that he had no reason to challenge Mr. Weinberg's testimony that he was able to borrow the $3 million necessary to fund the Plan but that Mr. Weinberg had to personally guarantee it, his wife had to personally guarantee it, he had to put his house on the loan, and his parents had to personally guarantee it. (Tr. at 344-45).

Finally, there was evidence that Weinberg may have decided to terminate in part to reap tax benefits. Aon sought to introduce notes taken by Forseter during a lunch where Mr. Weinberg, Weinberg's counsel, and Forseter were present. (*See* Def.'s Ex. 26). However, the notes are inadmissible hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is not admissible except as provided by the Federal Rules of Evidence or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress. Fed. R. Evid. 802. A statement is not hearsay if the "statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity." Fed. R. Evid. 801(d)(2). "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Fed. R. Evid. 805.

Forseter's notes present a hearsay within hearsay situation. The notes themselves are statements offered in evidence to prove the truth of the matter asserted, as are the statements allegedly made by Mr. Weinberg during the lunch. As set forth in McCormick on Evidence:

> In the usual situation, two stages of inquiry are involved. First, does the primary statement qualify under a hearsay exception? If so, the hearsay rule allows its use to prove that the included statement was made, which may end the inquiry. Ordinarily, however, the included statement will be offered to prove the truth of the facts that it asserts. In that event, the second stage of inquiry is required: Does the included statement also qualify under a hearsay exception? If the answer again is in the affirmative, the requirements of Rule 805 are met. However, if the

>     included statement is inadmissible, the rule is not
>     satisfied, and the statements are excluded.

McCormick on Evidence § 324.1 (5th ed. 1999).

For example, a police report of an accident investigation provides an example of hearsay within hearsay. *Id.* Since the officer's report, the primary statement, is admissible as a public record, statements contained in the report will be admissible only if they conform to the requirements of a hearsay exception such as for excited utterance or dying declaration. *Id.*

In this case, Forseter's notes are the primary statement. However, Aon does not identify and the Court does not know of any hearsay exception that would apply to the notes. Thus even if Mr. Weinberg's statements contained in the notes are not hearsay as a party admission, the notes are nevertheless inadmissible under Rule 805. *See Cearfoss Const. Corp. v. Sabre Const. Corp.*, 1989 WL 516375, *3 (D.D.C. Aug. 14, 1989) (handwritten notes including all statements quoted therein do not satisfy any exceptions to the hearsay rule and constitute inadmissible hearsay, and the apparent quotations of the arbitrator contained within the notes constitute inadmissible multiple hearsay)(citing *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1376 (2d Cir. 1988)(handwritten notes of an NFL official allegedly reflecting the comments of an NFL players union official, that were being offered for their truth,

-22-

were properly excluded as multiple hearsay)); *Bausch & Lomb, Inc. v. C.I.R.*, T.C.M. (CCH) 1996-57 (1996)(portion of memorandum relating notes from a conversation note-taker had with another individual constitutes hearsay within hearsay not otherwise admissible pursuant to rule 805 of the Federal Rules of Evidence).

Since the notes are inadmissible hearsay, there is no evidence before the Court that Weinberg's decision to terminate the Plan was at all motivated by an attempt to reap tax benefits.

On the issue of termination, Mr. Weinberg was credible whereas Amoroso was not.  Mr. Weinberg answered questions on direct and cross-examination frankly.  His testimony that fully funded termination was a last resort was credible.  By comparison, Amoroso was evasive when answering questions on cross-examination and his testimony showed a bias in favor of Aon.  The Court finds that given Weinberg's options, it was reasonable for Weinberg to fully fund and terminate the Plan.

Yet even if fully funded termination was reasonable, Aon claims that it is not liable for the $177,782 in Category B because: (1) the damages are speculative; (2) Aon is not responsible for funding the Plan; (3) Weinberg would have had to fully fund the Plan at some time; and (4) Weinberg did not present sufficient evidence that it would have fully funded and terminated the Plan in January 1999 if Aon had advised Weinberg

of past violations.   (Def.'s Post-Trial Br. at 21-22; Def.'s

Rebuttal to Pl.'s Post-Trial Br. at 10-11).   The Court agrees.

Sanford and Amoroso both explained that the lump sum

distributions are a separate issue from the Plan's underfunded

status.  (Tr. at 245, 270-72).  This is because when a lump sum

is paid, both the Plan's assets and liabilities are decreased by

the amount of the payment, so the payment does not affect the

amount of underfunding.  (Tr. at 270-71).  Mr. Weinberg did not

contradict this testimony.  He testified that Aon is not

responsible for fully funding the Plan.  (Tr. at 103).  Amoroso's

conclusion that the distributions did not affect the underfunded

status of the Plan in any material way was not contradicted.

(Tr. at 271-72).

Mr. Weinberg explained that it is not unusual for

pension plans to be underfunded and that "the IRS does not force

companies to make up that underfunding so long as they make their

minimum required contributions year after year."  (Tr. at 108).

Amoroso agreed that it is not uncommon for plans to be

underfunded.  (Tr. at 320).  In years other than 2003, Weinberg

addressed the underfunding by making minimum contributions as

required by the I.R.S. with no expectation of fully funding the

Plan in one year.  (Tr. at 243).

Sanford testified that the Plan has been underfunded

from 1996 through the present.  (Tr. at 242).  He said the

underfunding was primarily the result of being a very generous plan of benefits that were increasing very rapidly as people earned large salaries and got additional years of service. (*Id.*) He said weak investment performance and low interest rates also contributed to the underfunding. (*Id.*) Weinberg did not contradict this testimony.

Amoroso testified that the Category B damages were "not valid" because fully funding the Plan is Weinberg's responsibility. (Tr. at 280-81). Amoroso claimed that whether a Plan had one violation versus ten violations over a five-year period, the I.R.S. would not treat the violations differently in deciding what to expect from the Plan. (Tr. at 316). He claimed there is a "carve-out for de minimus violations, so that sponsors have the ability to self-correct in the event of de minimis violations . . . ." (Tr. 316). However, he reluctantly admitted on cross-examination that there is some factoring by the I.R.S. of the degree of culpability of the Plan and that there is a continuum of reaction based on degree of culpability. (Tr. at 318-19).

Forseter testified that each of Distributions 1-5 individually put the Plan in jeopardy of being disqualified. (Tr. at 192). Mr. Weinberg testified that Weinberg's actuary that preceded WTR/Aon was also negligent. (Tr. at 149).

However, Mr. Weinberg also testified that had he known of the violations in 1999 he would have "fixed" it.   (Tr. 104).

Mr. Weinberg's own admission that Weinberg, not Aon, was responsible for the Plan's underfunding prevents Weinberg from recovering the $177,782.  Weinberg argues that Aon had a duty to discover that improper distributions calculated by Weinberg's previous actuaries had been made and to so advise Weinberg.  Yet, Weinberg did not allege in its Complaint that Aon had a duty to discover, or advise Weinberg of, Distributions 1-5. As the Court has already ruled, Weinberg can only recover on Distributions 6-10.  *See supra* Part A.

Even without Distributions 6-10, Weinberg had already violated the Top 25 rule and there is no evidence Weinberg would have been in any different position with the I.R.S.  Although there appears to be some factoring by the I.R.S. of the degree of culpability of the Plan, (Tr. at 318-19), Weinberg has not provided evidence of how its position would have been any different had only Distributions 1-5 been made.  Even if Aon had not directed Weinberg to make Distributions 6-10, Weinberg likely would be facing the same, or materially the same, situation where its only choice is to fully fund and terminate the Plan.

Moreover, the underfunded status was the result of Weinberg's administration of the Plan.  Weinberg does not allege that Distributions 6-10 affected the amount of the Plan's

-26-

underfunding.  The Plan became $177,782 more underfunded while Aon was its actuary, but there is no evidence that had Aon not directed Weinberg to pay Distributions 6-10, that Weinberg would have been in a better situation with the I.R.S.  It is just as likely that once Weinberg discovered Distributions 1-5, it would have had to fully fund and terminate the Plan.  The amount Weinberg would have to pay to fully fund the Plan would depend entirely on Weinberg, and not at all on Aon.

Finally, even if the I.R.S. had found that Weinberg was more culpable having made ten distributions rather than just five, Weinberg provided no evidence that the I.R.S. would have given Weinberg any different options to remedy the five distributions.  In fact, Weinberg suggests that the remedy would have been fully funded termination, the same remedy ultimately chosen after ten distributions.

The Court cannot say that Aon's direction for Weinberg to pay Distributions 6-10 was an act which immediately caused the $177,782 injury.  *See Huffman v. Sorenson*, 76 S.E.2d 183, 187 (Va. 1953)(citations omitted).  The Court finds that Weinberg's damages of $177,782, the difference between the amount needed to fully fund the Plan from January 1, 1999 to July 1, 2005 were not proximately caused by Aon's breach of its duty of care with respect to Distributions 6-10.

### 3. Category C damages

For Category C, Weinberg seeks costs and attorneys'
fees associated with the compliance program.  Weinberg argues
that because the compliance program did not exist until after
Aon's involvement, Weinberg could not have entered the compliance
program after paying Distributions 1-3.  Thus, Weinberg argues,
Aon's failure to advise Weinberg regarding the violations of the
Top 25 rule caused Weinberg to enter the compliance program.
This argument lacks merit because: (1) other compliance programs
existed prior to Aon's involvement; and (2) as explained above,
Weinberg cannot assert that Aon had a duty to advise Weinberg of
violations that occurred before Aon became Weinberg's actuary.
*See supra* Part A.

Forseter testified that the compliance program was not
codified until 2001 or 2002 and after Aon became Weinberg's
actuary.  (Tr. at 187).  However, Amoroso testified that other
voluntary compliance programs have existed since the late '80s or
early '90s.  (Tr. at 283-84).  Moreover, I.R.S. Revenue Rulings
indicate that a voluntary compliance program was announced in
1992 as a temporary program, was extended temporarily in 1993,
and extended indefinitely in 1994.  *See* Rev. Proc. 92-89, 1992-2
C.B. 498; Rev. Proc. 93-36, 1993-2 C.B. 474; 96-29, 1994-2 C.B.
778.  The program has been modified since 1994, but is still in
existence.  *See, e.g.,* Rev. Proc. 2003-44, 2003-1 C.B. 1051.

-28-

Weinberg also argues that Aon is liable for the damage done to Weinberg by entering the compliance program after Distribution 10 rather than after Distribution 3. Weinberg claims that it would have been easier, and thus less costly, to correct fewer violations. However, this argument assumes that Aon had a duty to advise Weinberg that Distributions 1-3 had occurred. The Court has already ruled that Weinberg cannot allege any duty with respect to Distributions 1-5. *See supra* Part A. Thus, the Court will not consider how Weinberg's position would be different had it entered the compliance program after Distribution 3.

However, Weinberg could be entitled to damages for the harm done to Weinberg by entering the compliance program after Distribution 10 rather than after Distribution 6, the first Distribution directed by Aon. Weinberg clearly had a duty not to direct Weinberg to make Distribution 6, and Aon has stipulated that it breached that duty. Thus Aon is liable for any attorneys' fees and costs incurred on the compliance program with respect to Distributions 6-10.

Weinberg explains that it did not provide evidence at trial regarding the fees with respect to the compliance program as a result of Distributions 6-10 because the parties agreed to submit evidence regarding attorneys' fees after trial. (Pl.'s Reply to Def.'s Post-Trial Br. at 9-10). During the trial,

Amoroso reluctantly admitted that the I.R.S. deals with violations on a continuum, (Tr. at 319), so it is possible that Weinberg incurred more fees and costs related to the compliance program as a result of having made Distributions 6-10.  Thus the Court will allow Weinberg to submit evidence post-trial of Category C damages that it incurred as a result of Distributions 6-10.  However, such evidence must produce sufficient facts to permit the Court to make an intelligent and reasonable estimate of the amount.  *See Commercial Bus. Sys., Inc.,* 453 S.E.2d at 268.

### 4. Category D damages

For Category D, Weinberg seeks costs and attorneys' fees associated with defending the Becker suit.  The Becker suit was filed on August 5, 2003 against Weinberg and its current and future principals for violations of ERISA.  (Pl.'s Ex. 136).  Becker alleges seven causes of action pursuant to the Employee Retirement Income Security Act, ("ERISA,") 29 U.S.C. §§ 1001, *et seq.*  One of the main allegations in the Complaint is that the defendants knowingly paid restricted lump sum distributions in derogation of law and discriminated against Becker by requiring her to post a security in order to receive a lump sum distribution.  Becker seeks damages, attorneys' fees, and costs.  Weinberg hired the law firm of Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig to defend Weinberg in the Becker suit.

Weinberg argues that because Aon failed to advise Weinberg regarding Distributions 1-3, Weinberg did not correct Distributions 1-3 and made Distributions 4-10.  Weinberg argues that these actions are the basis for the Becker suit, so Aon is liable for costs and attorneys' fees that Weinberg has incurred in defense of the Becker suit.

Aon argues that it is not liable because: (1) the Becker suit was not motivated by Distributions 6-10 or any of Aon's services as actuary; and (2) to the extent that Distributions 6-10 are relevant to the Becker suit, the degree of relevance is *de minimus*.  The Court agrees.

Weinberg offers no evidence that had Weinberg not made Distributions 6-10, Becker would not have filed her suit.  She alleges, *inter alia*, that:

- the failure to obtain security agreements or escrow agreements in connection with the payments of *lump sum distributions of benefits made to the ten persons* represented in the IRS correspondence was a planned act of Defendants . . . . (Pl.'s Ex. 136, ¶ 40)(emphasis added).

- Defendants knew or should have known that *the lump sum distributions of benefits made to highly compensated employees* . . . were made in contravention of the testing and distribution provisions in the rules applicable to qualified plans but did nothing to prevent such distributions from being made.  (*Id.* at ¶ 68)(emphasis added).

- Defendants used *distributions of lump sum payments to highly compensated employees*, without complying with the restrictions . . . as a method to effect settlement of claims against the [defendants] . . . . (*Id.* at ¶ 72)(emphasis added).

Like Category A, Category D contains damages caused by
Distributions 1-10 and Weinberg has not provided any evidence of
what portion of those damages were caused by Distributions 6-10.
Weinberg has not produced any facts to permit the Court to make
an intelligent and reasonable estimate of the amount of damages
in Category D which were caused by Aon's breach of its duty of
care with respect to Distributions 6-10.  Absent this evidence,
the Court must deny these damages.[5]

### 5. Amoroso's set-off argument

There remains the issue of an argument made by Amoroso
during trial.  Amoroso testified that the Plan "was actually
better off financially for having paid the lump-sum
distributions."  (Tr. at 302).  He testified that during 1999
through 2000, when Distributions 6-10 were paid, the Plan had
very poor investment performance.  (*Id.*)  By paying a lump sum,
the investment risk was transferred from the Plan to the
participant.  (*Id.* at 302-03).  Assuming that participants six
through ten had elected not to post security and not take lump

---

[5] The Court notes that unlike the Category C damages, additional
evidence on the amount of the Category D damages cannot show that Weinberg is
entitled to them.  The parties agreed that should the Court determine that Aon
is liable to Weinberg for the costs and fees in Categories C and D, they will
submit evidence of the amounts of those fees in a post-trial hearing pursuant
to Rule 54(d)(2)(B)-(D) of the Federal Rules of Civil Procedure.  (Stipulation
& Order, Dec. 16, 2004).  However, the Court finds that additional evidence on
the amount of fees and costs related to the Becker suit will not allow the
Court to make an intelligent and reasonable estimate of the damages caused by
Aon's breach with respect to Distributions 6-10.  *See Commercial Bus. Sys.,
Inc.,* 453 S.E.2d at 268.

sums, Amoroso concluded that the Plan "is better off on the order of about $400,000" having paid Distributions 6-10.  (*Id.* at 307).

Amoroso's conclusion was based on the assumption that had the Plan participants been told of the requirements to post security, they would have opted not to and would have taken their benefits over time.  (*Id.* at 352).  He testified that this assumption was based on his experience and the behavior of people in this Plan subsequent to 1999 and 2000.  (*Id.* at 353).  However, he admitted that the assumption was not based on the financial circumstances or wherewithal of any of the participants.  (*Id.*)  Amoroso admitted that his conclusion might be different with respect to Mr. Weinberg who "may very well have the financial ability to [post security and take a lump sum] and may choose to because of his own preferences about how to deal with money."  (*Id.* at 354-55).  Amoroso said his assumption "might" change based on the financial wherewithal of the particular participant.  (*Id.* at 355).  Finally, he agreed that generally the more wealth you have, the more able you are to post security and that all lump sum distributees were within the top 25 highly-compensated employees.  (*Id.*)

An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.  *Tyger Constr. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994)(citing *E. Auto Distribs., Inc. v.*

*Peugeot Motors of Am.*, 795 F.2d 329, 337 (4th Cir. 1986)).  In *E. Auto Distribs.*, the Fourth Circuit held that the district court acted within its discretion by excluding expert testimony on the grounds that it was based on assumptions which were speculative and not supported by the record.  795 F.2d at 337.  The expert in that case proposed to quantify damages by estimating the number of new dealers that the plaintiff would have established and additional sales which those dealers would have generated but for vehicle shortages allegedly caused by the defendant.  *Id.* at 337-38.  In so quantifying, the expert assumed that absent the vehicle shortages, the plaintiff would have had the same number of dealers in a given year that it actually had two years later.  *Id.*  However, in part because this assumption was not supported by any evidence presented at trial and because the plaintiff failed to otherwise offer any reasons why it might be accurate, the district court properly excluded the expert testimony.  *Id.*

Likewise, in the instant case, Amoroso assumed that distributees 6-10 would not have posted security.  This assumption was based on his experience, not on the financial wherewithal of those participants.  He did not have any information about the those participants' finances, other than the fact that they were within the top 25 highly-compensated people.  Moreover, he agreed that in general, the more wealth you have, the more able you are to post security.  His assumption is

-34-

speculative and not supported by the record.  Without considering
the financial wherewithal of distributees 6-10, Amoroso does not
know whether they would have posted the security had they known
of the requirement for a lump sum distribution.  These
distributees were among the top 25 highly-compensated people and
thus by Amoroso's own testimony, more able to post security.
Thus, the Court will exclude Amoroso's testimony concerning
whether Weinberg is better off having made the lump sum
distributions.

### III. Conclusions of Law

1.   Subject matter jurisdiction is proper pursuant to 28 U.S.C §
     1332(a) because the parties are diverse and the amount in
     controversy exceeds $75,000.  Personal jurisdiction over Aon
     is proper because it is a citizen of Virginia.  28 U.S.C. §
     1332(c)(1).

2.   Aon breached its duty of care with respect to Distributions
     6-10.

3.   Because the Complaint does not contain any allegation that
     Weinberg was seeking damages resulting from Aon's breach of
     its duty of care as to Distributions 1-5, Aon was not given
     fair notice and Weinberg may not recover based on those
     first five distributions.

4.   Weinberg has not produced any facts to permit the Court to
     make an intelligent and reasonable estimate of the amount of

damages in Category A which were caused by Aon's breach of its duty of care with respect to Distributions 6-10.  Absent this evidence, the Court will deny the Category A damages.

5.  Because Weinberg had disclosed that it was seeking the entire amount of the loan principal, Aon had notice that Weinberg was seeking the entire amount.  Aon is not prejudiced by Weinberg now seeking only a subset of that amount in the Category B damages.

6.  Forseter's notes are inadmissible hearsay.

7.  Weinberg's Category B damages of $177,782, the difference between the amount needed to fully fund the Plan from January 1, 1999 to July 1, 2005 were not proximately caused by Aon's breach of its duty of care with respect to Distributions 6-10.

8.  Aon is liable for any attorneys' fees and costs Weinberg incurred related to the compliance program with respect to Distributions 6-10.  The Court will allow Weinberg to submit evidence post-trial of these Category C damages that it incurred as a result of Distributions 6-10.  However, such evidence must produce sufficient facts to permit the Court to make an intelligent and reasonable estimate of the amount.

9.  Weinberg has not produced any facts to permit the Court to make an intelligent and reasonable estimate of the amount of

damages in Category D which were caused by Aon's breach of its duty of care with respect to Distributions 6-10.  Absent this evidence, the Court will deny these damages.

10. Because Amoroso's testimony concerning whether Weinberg is better off having made the lump sum distributions rested on an assumption that was speculative and not supported by the record, the Court will exclude that testimony.

For the reasons stated above, Aon is liable to and must indemnify Weinberg for Weinberg's attorneys' costs and fees associated with the compliance program with respect Distributions 6-10.  However, the Court is unable to make an intelligent and reasonable estimate of that amount and the Court will allow Weinberg to submit evidence post-trial of these damages.  Aon is not liable to Weinberg for any of the other damages sought either because Weinberg has not shown that Aon's breach of its duty was the proximate cause of the damages, or because the Court is unable to make an intelligent and reasonable estimate of the amount of damages.  An appropriate Order will issue.

June 28, 2005                    _____/s/_____
Alexandria, Virginia             UNITED STATES DISTRICT COURT JUDGE